Kevin MONAHAN, Plaintiff, Appellant,

v.

DORCHESTER COUNSELING CENTER,
INC., et al., Defendants, Appellees.

No. 91–1844.

United States Court of Appeals,
First Circuit.

Heard Jan. 8, 1991.

Decided April 15, 1992.

Robert G. Flanders, Jr., with whom Neal J. McNamara, and Flanders & Medeiros Inc., Providence, R.I., were on brief for plaintiff, appellant.

Robert D. Fleischner and Steven J. Schwartz, Northampton, Mass., Center for Public Representation, on brief for Center for Public Representation, Coalition for the Legal Rights of the Disabled, United Families, Inc., Alliance for the Mentally Ill of Greater Fall River, and Hyland House, Inc., amici curiae.

Douglas H. Wilkins, Asst. Atty. Gen., Government Bureau, with whom Scott Harshbarger, Atty. Gen., and Eleanor Coe, Asst. Atty. Gen., Government Bureau, Boston, Mass., were on brief for state defendants, appellees Henry Tomes, James Stratoudakis, Ph.D., Daniel K. Amigone, Mark A. Fridovich, Ph.D., Alfred E. Darby, M.D., Meryl Moss, Randy Morse, David Kazen, Martin Bauermeister, M.D., Robert Marot, James Farelly, Cynthia Pillsbury, R.N., Toni Monteiro, and Sheila Wallace.

Thomas M. Elcock with whom Peter C. Knight, Rhonda L. Rittenberg, Denise K. Cahalane and Morrison, Mahoney & Miller, Boston, Mass., were on brief for defendants, appellees Michael St. Germaine, Lorna Jones and Dorchester Counseling Center, Inc.

Before TORRUELLA, Circuit Judge, ALDRICH and CAMPBELL, Senior Circuit Judges.

LEVIN H. CAMPBELL, Senior Circuit Judge.

In this suit under 42 U.S.C. § 1983, plaintiff Kevin Monahan, a mentally ill person, seeks injunctive relief and damages against the Commonwealth of Massachusetts ("Commonwealth") and various individuals and entities. While residing at a Commonwealth-run group home, Monahan asked to be taken to another facility. After being denied admission to the latter, Monahan was driven back to the group home by a Commonwealth employee. During the return trip, Monahan jumped out of a van and ran onto an interstate highway where he was struck by a car and severely injured. The District Court for the District of Massachusetts granted defendants' motion to dismiss and denied plaintiff's motion to amend his complaint to add a new cause of action. We affirm.

I.

In reviewing the dismissal of the complaint, we take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff. *The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 20 (1st Cir.1989). According to the complaint, Monahan was first hospitalized for mental illness in 1978 and has been hospitalized on and off since then. On or about April 1, 1989, Monahan "voluntarily committed himself" to a group home in Fall River, Massachusetts known as Millie's Cottage.[1] At the same time, Monahan was an outpatient at the Corrigan Mental Health Center ("Corrigan"), a treatment facility for the mentally ill operated by the Massachusetts Department of Mental Health ("DMH").

During the evening of April 1, 1989, Monahan told the staff at Millie's Cottage that he was having an anxiety attack. A Millie's Cottage worker attempted to drive Monahan to Corrigan's crisis intervention facility, but Monahan twice jumped out of the vehicle. After a Millie's Cottage worker informed Corrigan staff of Monahan's actions, Corrigan's campus police came to Millie's Cottage, picked up Monahan, took

---

1. The complaint does not clearly allege the relationship of Millie's Cottage to the Commonwealth of Massachusetts, and it is not clear whether that facility was administered directly by the Commonwealth or by a private corporation under contract with the Commonwealth. Some of the defendants assert that, for this reason, they did not act "under color of state law." For purposes of this appeal, we assume *arguendo* that all the defendants acted under color of state law, affirming the district court on other grounds.

him to Corrigan, and then returned him to Millie's Cottage.

Monahan continued to suffer from anxiety attacks and hallucinations. The next night he was again taken to Corrigan by Corrigan's campus police. At Corrigan, Monahan received both medication and a prescription for additional medication from the medical director, defendant Alfred Darby. Monahan was then returned to Millie's Cottage by the campus police. He continued to exhibit anxious behavior during the next few days, and, on the night of April 6, he told Millie's Cottage staff that he wanted to die and asked to be taken to Corrigan. A staff worker at Millie's Cottage called Corrigan and was instructed by defendant Michael St. Germaine,[2] a Crisis Intervention Services staff worker, to bring Monahan to Corrigan.

At this point, defendant David Kazen, apparently a DMH employee working at Millie's Cottage, drove Monahan to Corrigan in a van. At Corrigan, Monahan told St. Germaine that he was going to kill himself. St. Germaine phoned the psychiatrist on call, defendant Martin Bauermeister,[3] telling him of Monahan's condition and reporting, inaccurately as it was later discovered, the amount of medication Monahan had received on his last visit to Corrigan. Bauermeister, without personally examining Monahan, prescribed that amount of medication (i.e., half the earlier dose), which was administered immediately. Both Bauermeister and St. Germaine refused to admit Monahan to Corrigan.

When Monahan was refused admission, Kazen escorted him back into the van. While the van was parked, Monahan said he did not want to return to Millie's Cottage and jumped out. Kazen and Monahan went back inside the Corrigan facility, and Monahan again asked to be admitted. St. Germaine refused to admit him, and Kazen and Monahan returned to the van.

While en route to Millie's Cottage, the van stopped at a stoplight. Monahan jumped out and began walking down the off ramp of an interstate highway. Kazen, instead of notifying the police or attempting to stop Monahan, returned to Millie's Cottage. There, he called St. Germaine, and two other Millie's Cottage workers were dispatched to look for Monahan. Before they arrived, Monahan was struck by a car and severely injured.

Monahan filed a 20–count complaint[4] in the District Court for the District of Massachusetts, naming as defendants the Commonwealth of Massachusetts and 21 individuals and entities. Count I alleged that all the defendants had "intentionally and/or with reckless indifference to plaintiff's rights, deprived plaintiff of his right to life, liberty, and property without due process ... in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution." The specific allegations concerning this violation included "failing to monitor, transport and supervise plaintiff properly," "failing to provide adequate diagnosis, treatment and related services," and "failing to notify the police" when plaintiff left the van. Counts II through VI made the same allegations, breaking down the "fail[ure] to diagnose," "fail[ure] to arrange for ... safe transport," etc., according to the specific groups of defendants allegedly responsible for these actions (or inactions). Count VII alleged that several defendants had violated 42 U.S.C. § 10841, the "Restatement of Bill of Rights for Mental Health Patients" and apparently sought to recover directly under that statute. In addition, Count VIII, which plaintiff sought to add in a proposed second amended complaint, alleged a cause of action under § 1983 for the same violations of § 10841. The remaining 13 counts alleged violations of Massachusetts statutory and common law.

The district court granted defendants' motion to dismiss and denied plaintiff's mo-

---

2. St. Germaine was employed by defendant Dorchester Counseling Center, Inc., a private corporation. For purposes of this appeal, we assume that he acted under color of state law.

3. Bauermeister was a DMH employee.

4. Monahan filed a complaint on April 6, 1990 and an amended complaint on June 11, 1990. We refer here to the amended complaint.

tion to file the second amended complaint. The court found that Monahan had failed to state a § 1983 claim because defendants' actions did not "shock the conscience." Furthermore, Monahan's complaint was dismissed pursuant to *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), because Monahan was a voluntary patient not confined by the state against his will. The court further held that Monahan had no claim under § 10841 because that statute neither establishes a private cause of action nor creates rights enforceable under § 1983. Finally, the court declined to exercise its pendent jurisdiction over the remaining state law claims. *Monahan v. Dorchester Counseling Center, Inc.*, 770 F.Supp. 43 (D.Mass.1991).

## II.

We shall assume for purposes of this appeal that in failing to supervise and look after Monahan more carefully, defendants might be found not just negligent but "deliberately indifferent." Nonetheless, while their conduct could have violated state tort law, it did not violate either the United States Constitution or 42 U.S.C. § 10841.

### A. *The Constitution*

In *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 2462–63, 73 L.Ed.2d 28 (1982), the Supreme Court held that a mental patient *involuntarily committed* to a state hospital enjoyed "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." On the other hand, in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Court held that county officials did not violate a young boy's due process rights when, in spite of repeated warnings, they failed to take action to protect the boy from beatings by his father.

Monahan's status falls somewhere between that of the plaintiffs in *Youngberg* and *DeShaney*. He was not involuntarily committed, as was the plaintiff in *Youngberg*. However, he did live for six days in a facility administered by (or at least on behalf of) the Commonwealth. His relationship to the state was therefore considerably closer than that of the plaintiff in *DeShaney*, who lived in a private home. The latter factual distinction notwithstanding, we think this case is governed by the rationale of *DeShaney*.

In *DeShaney*, the Court held that the county officials had not violated the boy's substantive due process rights because

> [t]he [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

109 S.Ct. at 1003. The Court noted that *Youngberg* and other cases had recognized that the State has "in certain limited circumstances ... affirmative [constitutional] duties of care and protection with respect to particular individuals." *Id.* at 1004–05. The Court distinguished those cases, however, because

> they stand only for the proposition that when the State takes a person into its custody and *holds him there against his will*, the constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being [citations omitted].... [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause....

*Id.* at 1005–06 (emphasis added).

It follows from *DeShaney* that Monahan has failed to state a viable claim for denial of substantive due process. Even if some or all of the defendants were found to have acted with "deliberate indifference" to

Monahan's needs in failing properly to treat and manage him, so as to render him vulnerable to being hit by a car, their misconduct violated no constitutional duty. Monahan's remedies, like those of most others in similar situations, lie in the arena of tort, not constitutional law.

The complaint alleges that Monahan "voluntarily committed himself to the care and custody [of DMH and Millie's Cottage]." Because the state did not commit Monahan involuntarily, it did not take an "affirmative act" of restraining his liberty, an act which may trigger a corresponding due process duty to assume a special responsibility for his protection. *See Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 466 (3d Cir.1990) (denying, on summary judgment, the due process claim of a mental patient who died while voluntarily living in a group home because the patient was "not deprived of freedom 'through incarceration, institutionalization or other similar restraint of personal liberty'") (quoting *DeShaney*, 109 S.Ct. at 998).

Monahan attempts to distinguish *DeShaney* on various grounds. First, relying on pre-*DeShaney* authority, Monahan claims that even without an involuntary commitment, he had a "special relationship" with the Commonwealth. *See Germany v. Vance*, 868 F.2d 9, 15 (1st Cir.1989).

In *DeShaney* itself the plaintiff argued that he had a "special relationship" with the state because Department of Social Services workers knew of the threat of abuse and proclaimed their intention to protect him. The Court rejected this argument. 109 S.Ct. at 1004. Monahan attempts to distinguish this case because, unlike Joshua DeShaney, who lived at home with his father, Monahan lived for six days in a facility administered by (or under contract to) the Commonwealth of Massachusetts. Moreover, immediately before the accident, Monahan was being driven by a Commonwealth employee in a Commonwealth van.

These factual differences do not affect our view that Monahan lacks a constitutional claim. The basis for the Court's rejec-

tion of DeShaney's special relationship argument was that the state had not "restrain[ed his] liberty ... render[ing] him unable to care for himself...." *Id.* at 1005. Although Monahan may have had closer contacts with the state than did Joshua DeShaney, he was not being held "against his will," nor had the state used its sovereign power to "render[ ] him unable to care for himself." The state's negligence or heedlessness does not, therefore, take on the character of an affirmative deprivation of life, liberty or property without due process of law. 109 S.Ct. at 1003.

While *DeShaney* controls in any event, our opinion in *Germany* is not to the contrary. In *Germany*, the plaintiff, a young girl, had been committed to the custody of the Massachusetts Department of Youth Services ("DYS") as the result of an assault and battery charge brought by her father. While she was under the custody of DYS (but living in various private homes), DYS workers learned that the assault and battery charge had been fabricated but failed to inform her. This court held that plaintiff's right of access to the courts could have been violated, in part because "defendants had the sort of 'special relationship' with plaintiff that would give them, in appropriate circumstances, a duty to take affirmative steps" to protect that right. 868 F.2d at 15.

This court denied plaintiff's petition for rehearing, filed after *DeShaney* had been decided. After rejecting plaintiff's arguments, our memorandum and order denying the petition went on to hold that there was a

> "special relationship" (custodial in nature) between [the] state officials and a juvenile in their custody. [Citation omitted]. This holding is in accord with the Supreme Court's observation in *DeShaney* that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being."

*Id.* at 23 (quoting *DeShaney*, 109 S.Ct. at 1005). Thus, it was critical to our memo-

randum in *Germany* that formal custody proceedings had occurred, placing the plaintiff in the state's custody against her will. Here, where no such involuntary commitment has occurred, Monahan's "special relationship" argument is without force.[5]

Relying on a separate line of pre-*DeShaney* authority, Monahan also argues that, despite the lack of a formal commitment, he was *de facto* a ward of the state. In *Harper v. Cserr*, 544 F.2d 1121 (1st Cir. 1976), this court speculated that a voluntary mental patient's husband might possibly have a constitutional claim against state officials for failure to have prevented the patient's suicide, if he could establish "a sufficient combination of helplessness on the part of the deceased, and wanton callousness on the part of those caring for her." 544 F.2d at 1124. This court observed that the rationale applicable to involuntarily committed patients might possibly apply to some voluntary mental patients because, "depending on [their] degree of disability, the availability of other resources and of parents, spouses, friends and guardians ... [, voluntary patients] may or may not be compelled de facto to endure the conditions at a state facility." *Id.* at 1123. Since *Harper*, other federal courts have taken similar approaches. *See, e.g., Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239, 1246 (2d Cir.1984) ("state chose to house ... voluntary [mental patient] residents, thus making them dependent on the state"); *Goodman v. Parwatikar*, 570 F.2d 801, 804 (8th Cir.1978) (following *Harper*). Recently, the Supreme Court itself questioned whether, in "the special context of mental health care," a voluntary patient is truly capable of exercising his freedom to leave a residential care facility. *See Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 988, 108 L.Ed.2d 100 (1990). *Zinermon*, however, dealt with the procedural adequacy of a

mental patient's "informed consent" to voluntary treatment. It did not suggest that a voluntarily committed patient would gain constitutional as well as tort remedies for negligent harm done by state caretakers.

Monahan's complaint did not allege that he would have been barred from leaving Millie's Cottage upon request. Monahan appears to have come to Millie's Cottage of his own accord on April 1 and remained there for only six days. To be sure, Monahan's mental condition may have made him functionally dependent on his caretakers, but no more so than is true of many other noncommitted ill persons in a hospital or outpatient setting. His helplessness was not attributable to the state's having taken him into custody involuntarily. *DeShaney* teaches that the Constitution is implicated only when the state takes an "affirmative act" which "restrain[s] the individual's freedom to act on his own behalf." 109 S.Ct. at 1005. Here, where it was Monahan's own mental condition alone that impinged upon his freedom to leave, it was not the state that deprived him of that freedom. The state not having restrained Monahan "against his will," the *Constitution* did not impose upon it any responsibility for his safety and well-being. *DeShaney*, 109 S.Ct. at 1005–06.

Monahan calls to our attention certain language in *DeShaney* and in court of appeals opinions interpreting that case. First, Monahan points to the language in *DeShaney* that "[w]hile the state may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." 109 S.Ct. at 1006. Monahan argues that, here, the defendants created, or at least rendered him more vulnerable to, a danger when they transported him in the van. Kazen and his superiors at Millie's Cottage knew Monahan had a propensity to jump out of automobiles and had twice called on

5. Monahan places great reliance on the footnote in *DeShaney* stating that "[h]ad the State by the affirmative exercise of its power removed [DeShaney] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an

affirmative duty to protect." 109 S.Ct. at 1006, n. 9. This statement, however, supports the very position we take here, namely that where the state's coercive power is not involved, there can be no *constitutional* (as opposed to tort) right to careful treatment.

Corrigan's campus police to transport him. On this occasion, however, they created a danger to Monahan by transporting him in a van without restraints.

We agree that had the Commonwealth not transported Monahan in its van, he would not have suffered the particular injury he suffered. In this sense, the Commonwealth could plausibly be said to have rendered him more vulnerable to danger. In a tort case, this might have had some significance. But this is not the kind of "affirmative act" on the part of the state which would give rise to a *constitutional* rather than a tort duty to protect Monahan. The Commonwealth's conduct here was fundamentally no different from that in *DeShaney:* it failed to protect Monahan from injury—an injury which occurred at the hands of a private actor because of Monahan's vulnerability stemming from his mental condition. Although the Commonwealth may have played some causal role in the harm, it did so only because Monahan voluntarily availed himself of a Commonwealth service. The Commonwealth did not force Monahan, against his will, to become dependent upon it. Thus, the Commonwealth's actions, while possibly negligent or even willfully indifferent or reckless, did not take on the added character of violations of the federal Constitution.

To hold that by negligently (or with "deliberate indifference") giving Monahan a ride in an insecure vehicle—thereby rendering him "more vulnerable" to a danger—the Commonwealth committed a constitutional violation, would convert most torts by state actors into constitutional violations. For example, a veteran's administration doctor who negligently operates on a patient, worsening his condition, can be said to have rendered the patient more vulnerable to a danger. The Supreme Court clearly had in mind something more when it referred to "render[ing a party] more vulnerable to [a danger]." 109 S.Ct. at 1006.

Finally, Monahan cites several circuit cases which distinguished *DeShaney* and allowed § 1983 actions to go forward. None of those cases, however, (with one possible exception) support his position. None involved mental health care.[6] Nor did they involve the negligent (or deliberately indifferent) provision of services to a party voluntarily seeking those services. Rather, all involved some coercive exercise of government power which either forcefully restrained a party from protecting himself from harm or restrained others from protecting him. *See, e.g., Ross v. United States,* 910 F.2d 1422 (7th Cir.1990) (county official prevented city officials from rescuing drowning boy); *Horton v. Flenory,* 889 F.2d 454 (3d Cir.1989) (police officer's presence during beating of plaintiff by former police officer effectively prevented plaintiff from leaving); *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), *cert. denied,* — U.S. ——, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990) (police officer took drunk driver's car keys and left him on the highway where he later suffered injury). *Cf. Cornelius v. Town of Highland Lake, Alabama,* 880 F.2d 348 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990) (town officials brought inmates to town hall to do work; inmates later abducted town clerk).

The last case cited above, *Cornelius* contains some language arguably supporting plaintiff's position. The court held that, in addition to creating the dangerous situation, the town officials exercised a "degree of control ... over [plaintiff] as Town Clerk." *Id.* at 356. If an employer can be said to exercise a relevant degree of control over an employee (even though the employee can quit), mental health officials can likewise be said to exercise control over a voluntary mental patient (even though the patient can leave). To the extent *Cornelius* is inconsistent with our holding, we decline to follow it. We note, moreover,

---

**6.** *Thomas S. By Brooks v. Flaherty,* 902 F.2d 250 (4th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990), did involve mental health care, but that case is inapposite. That case was a class action dealing with the appropriateness of a remedy for a constitutional violation, not the existence of such a· violation. The court allowed a remedy for violations of the constitutional rights of involuntarily committed patients to be applied to patients who, having once been confined, were subsequently discharged.

that this reasoning may have been called into question by a recent Supreme Court case rejecting a claim "that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *See Collins v. City of Harker Heights, Texas,* —— U.S. ——, ——, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992).

In short, although defendants' actions here may have been tortious, they did not involve the affirmative exercise of government power required to make out a constitutional violation.[7]

### B. *42 U.S.C. § 10841*

■ Monahan sought to recover under 42 U.S.C. § 10841 based on two theories. First, Count VII of his first amended complaint stated that defendants' failure to admit him to Corrigan, "provide appropriate treatment," or provide "reasonable protection from harm" violated 42 U.S.C. § 10841. Second, Count VIII of his proposed second amended complaint noted "[v]iolations under 42 U.S.C. § 10841" and alleged that the actions set forth in Count VII violated "42 U.S.C. § 1983 and the Fourteenth Amendment...."

Thus, both Count VII of the first amended complaint and the proposed new Count VIII seem to have alleged violations of plaintiff's statutory rights under § 10841. Count VII apparently sought to recover directly under that statute, while the proposed Count VIII apparently sought to recover under the theory that the deprivation of Monahan's § 10841 rights under color of

state law was actionable under § 1983. *See Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980) (allowing recovery under § 1983 for federal statutory violations).

The district court rejected both theories of recovery, concluding that § 10841 created neither a cause of action nor enforceable federal rights. We agree on the latter ground. Therefore, regardless of the existence of a cause of action (either under § 10841 or § 1983), plaintiff has no enforceable rights under § 10841.

42 U.S.C. § 10841, titled the "Restatement of Bill of Rights for Mental Health Patients" was enacted in 1986. It restates the provisions of 42 U.S.C. § 9501, the mental health "Bill of Rights," using almost exactly the same language. Section 10841 provides that

*[i]t is the sense of Congress* that, as previously stated in [42 U.S.C. § 9501 et seq.], each State *should* review and revise, *if necessary,* its laws to ensure that mental health patients receive the protection and services they require, and that in making such review and revision, States *should* take into account the recommendations of the President's Commission on Mental Health and the following....

42 U.S.C. § 10841 (emphasis added). The statute goes on to list the specific kind of treatment which mental patients "should" receive.

This use of the terms "should" and "the sense of Congress" indicate that the stat-

---

**7.** We discuss briefly two additional arguments. First, plaintiff claims that the defendants' action "shocked the conscience." This argument was made and rejected in *DeShaney,* 109 S.Ct. at 1004. Our conclusion, under *DeShaney,* that the lack of an affirmative exercise of state power precludes Monahan's claim makes it unnecessary to consider this argument. Second, plaintiff's brief mentions a Massachusetts regulation which purportedly provides him with an enforceable right to treatment. *See* 104 CMR 3.10(3). The principal purpose of this citation apparently is to reinforce plaintiff's argument, for substantive due process purposes, that there is no distinction between the rights of voluntary and involuntary patients. However, the brief also mentions a procedural due process claim for denial of state created rights to treatment. We reject this claim for two reasons. First, it is

open to question whether the regulations cited by plaintiff actually create enforceable rights. *See Woodbridge v. Worcester State Hospital,* 384 Mass. 38, 423 N.E.2d 782, 785 (1981). Second, it is not clear whether the state has provided plaintiff with any remedy for a deprivation of those rights. *See Parratt v. Taylor,* 451 U.S. 527, 538–40, 101 S.Ct. 1908, 1914–15, 68 L.Ed.2d 420 (1981). Plaintiff's counsel represented at oral argument that plaintiff has a state court action pending but expects to face a sovereign immunity problem. To be sure, *Woodbridge* indicates that plaintiff's state court action may face an immunity barrier. But absent any allegations in the complaint concerning the state court procedures, or thorough briefing on this point, we decline to speculate concerning plaintiff's state law claim for purposes of determining whether there exists an adequate state law remedy.

ute is merely precatory. Although no other federal court of appeals appears to have considered this question, we agree with the District Court for the Eastern District of Pennsylvania that,

> [t]he statutory language, setting forth "the sense of Congress" and recommending that states "should" review their laws regarding mental health patients is plainly precatory. Also, the "rights" set forth are for the State's consideration when undertaking this review. Significantly, this section neither requires nor prohibits any action on the part of the states or any other party. In addition, the legislative history is consistent with Congress's use of precatory statutory language. The Senate Report declares that the Bill of Rights is a "statement of Congressional viewpoint," and emphasizes that this section *"further encourages* each state to review and revise its laws to insure that mentally ill persons receive the protection and service they require."

*Brooks v. Johnson and Johnson, Inc.,* 685 F.Supp. 107, 108 (E.D.Pa.1988) (emphasis in original). *See also, Croft v. Harder,* 730 F.Supp. 342, 350–51 (D.Kan.1989) (same construction of § 9501).

The *Brooks* court relied heavily on a comparison between § 10841 and 42 U.S.C. § 6010, the latter having been found "precatory" by the Supreme Court in *Pennhurst State School v. Halderman,* 451 U.S. 1, 18, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981). Section 6010 was part of a joint federal/state funding program which contained Congressional "findings" that, for example, "persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities." 42 U.S.C. § 6010(1). The Supreme Court held that "we find nothing in the Act or its legislative history to suggest that Congress intended to require the States to assume the high cost of providing 'appropriate treatment' ... to their mentally retarded citizens." 451 U.S. at 18, 101 S.Ct. at 1540. Section 10841 uses language even more clearly precatory than § 6010,[8] and we agree with the *Brooks* court that *Pennhurst* supports the conclusion that § 10841 creates no enforceable federal rights.[9] *See also Suter v. Artist M.,* — U.S. —, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (provision in federal funding program for state adoption services, although it contained certain mandatory terms, created neither rights enforceable under § 1983 nor a private cause of action).

Having concluded that *DeShaney* bars plaintiff's constitutional claim, we need not consider the additional arguments raised by defendants.

The district court's order of August 5, 1991 denying plaintiff's motion to amend the complaint and allowing defendants' motion to dismiss is affirmed.

*So ordered. Costs to appellees.*

---

**8.** Section 10841 starts out by saying "it is the sense of Congress" and uses the term "should" throughout. Section 6010, on the other hand, discusses congressional "findings" and alternates between arguably mandatory language ("persons ... have a right"), and language that is clearly precatory ("treatment ... should be designed"). *See* 42 U.S.C. § 6010(1) and (2).

**9.** Plaintiff makes several counterarguments, of which we respond to two. First, plaintiff attempts to distinguish § 6010 on the basis that it was a joint federal/state funding program. That distinction, if it has any relevance at all, only means that plaintiffs in *Pennhurst* had a stronger argument than plaintiff here. Because § 6010 was part of a joint funding program, plaintiffs in *Pennhurst* could argue that Congress had imposed requirements on the states' mental health systems as a condition for receiving federal funds, rather than merely mandating such requirements in the exercise of its power under the § 5 of the Fourteenth Amendment. *See* 451 U.S. at 17–18, 101 S.Ct. at 1539–40.

Second, plaintiff points out that 42 U.S.C. § 10851 provides that § 10841 creates no new rights. Because § 9501 contains no similar provision, plaintiff argues that the combined effect of the §§ 9501 and 10841 is that § 9501 creates new rights which are reiterated in § 10841. The only effect of § 10851, he says, is to ensure that § 10841 be construed merely as reaffirming Congressional support for the rights already created in § 9501, not as creating any additional new rights. While clever, this argument is belied by the obviously precatory language in both §§ 9501 and 10841.