**In re: POLAROID CORPORATION SECURITIES LITIGATION**

No. CIV.A. 99–CV–11245–PBS.

United States District Court, D. Massachusetts.

March 21, 2001.

Samuel H. Rudman, Milberg, Weiss, Bershad, Specthrie & Lerach, Steven G. Schulman, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Stephen Moulton, Nancy F. Gans, Moulton & Gans, LLP, Boston, MA, Steven E. Cauley, Law Offices of Steven E. Cauley, Little Rock, AK, W. Paul Needham, Needham & Warren, Boston, MA, Sanford P. Dumain, Milberg, Weiss, Bershad, Hynes & Lerach, Samuel H. Rudman, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Neil Rothstein, Scott & Scott LLC, Colchester, CT, Jeffrey R. Krinsk, Finkelstein & Krinsk, San Diego, CA, Harold B. Obstfeld, Law Office of Harold B. Obstfeld, P.C., Jack G. Fruchter, Fruchter & Twersky, Mel E. Lifshitz, Bernstein, Leibhard & Lifshitz, LLP, New York City, Paul J. Geller, Cauley & Geller, LLP, Boca Raton, FL, Benjamin Y. Kaufman, Milberg Weiss Bershad Hynes & Lerach LLP, Mel Lifshitz, Bernstein, Leibhard & Lifshitz, LLP, Harold B. Obstfeld, Law Office of Harold B. Obstfeld, Jack G. Fruchter, Fruchter & Twersky, Jack G. Fruchter, Fruchter & Twersky, New York City, for Plaintiffs.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Henry B. Gutman, Michael J. Chepiga, Simpson, Thacher & Bartlett, New York City, for Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

SARIS, District Judge.

## I. INTRODUCTION

In this consolidated class action, Plaintiffs allege that Defendants Polaroid Corporation ("Polaroid" or the "Company"), Gary DiCamillo, the Chief Executive Officer and Chairman, and William J. O'Neill, Jr., the Chief Financial Officer and Executive Vice President, knowingly or recklessly disseminated materially false and misleading statements regarding the Company's financial condition in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10(b)–5, 17 CFR § 240.10b–5. The members of the proposed class [1] engaged in securities transactions from April 16, 1997 through August 28, 1998, the class period.

The linchpin of the complaint is that Polaroid's press releases and Securities and Exchange Commission (SEC) filings were misleading for failing to disclose Polaroid's sales and revenue recognition practices, its aggressive loading, and the decline in the market for instant film. Plaintiffs also claim that Defendants improperly recognized revenue in violation of GAAP standards growing out of the so-called CITIC transaction in Hong Kong in the second fiscal quarter of 1997.

Among other things, Defendants have moved to dismiss Plaintiff's First Consolidated Amended Class Action Complaint for failure to plead fraud with sufficient particularity pursuant to Fed.R.Civ.P. 12(b)(6) & 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4. With respect to the

---

1. The members of the proposed class include purchasers of common stock and call options and sellers of put options of Polaroid Corporation.

CITIC transaction, Defendants contend that Plaintiffs have failed to allege loss causation.

After a hearing, the Court **ALLOWS** Defendants' Motion to Dismiss the Consolidated Amended Complaint.

## II. BACKGROUND

On a motion to dismiss, the Court recites the facts relevant to the instant motion as they are alleged in the plaintiffs' pleadings. *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 988 (1st Cir. 1992); *Coyne v. City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.1992).

Polaroid manufactures and supplies instant photographic cameras and film, imaging hardware and software, medical diagnostic imaging media, graphics imaging systems, polarizers, and holographic films. The Company's primary and most well-known product is instant film. By 1995, Polaroid's instant film technology was being eclipsed rapidly by digital photography technology. Polaroid attempted to make a transition to new technologies and products, but was often unsuccessful in the market. The Company remained dependent upon instant film revenue to generate cash flow, despite declining sales and the gray market that had developed for this product.

On February 3, 1995, Polaroid issued a press release announcing "a plan of action" to enhance its profitability, including implementation of a dealer inventory adjustment program (the "DIAP"). The press release read:

Implementation of a dealer inventory adjustment program. This will enable Polaroid to exercise better control over its distribution channels, strengthen sales of integral film, and sharply reduce the "gray market" for Polaroid products. The company will target more of its promotional efforts toward consumers to encourage greater demand for instant photographic products. As dealers adjust inventory levels and retail sales increase, there will be an increase in the profitability of the core photographic business. Polaroid expects to have an operating loss, excluding a restructuring charge, on the order of $20 million in the first quarter of 1995, primarily as a result of the inventory adjustment program.

(First Consolidated Am. Class Action Compl. ¶ 24.)

As reflected in two analysts' published commentary, the market allegedly understood this announcement to mean that Polaroid would stop its customary, end-of-quarter practice of loading customers with more product than needed by offering various discounts, promotions, and incentives.[2] In light of Polaroid's believed termination of this practice, sales of instant film were expected to be truly representative of consumer demand.

The DIAP was unsuccessful in promoting additional sales. As a result, Polaroid resumed its loading practices two quarters after announcing implementation of the DIAP, which coincided with Gary DiCamillo's October 1995 appointment as

---

**2.** For example, a report issued by Salomon Brothers, Inc. on February 27, 1995 stated:

In the past, Polaroid has sold large volumes of photographic products to distributors, such as Sam's Wholesale, by offering steep discounts at the ends of every quarter. These distributors then sold the goods to foreign retailers at less-than-market prices, undercutting the company's ability to sell to the retailers directly. We estimate that such sales to distributors account for 10%—20% of U.S. instant film revenues. *Polaroid will try to eliminate this practice* with the hope that it can replace the lost volume through direct sales and higher prices. (Id. at ¶ 27 (emphasis added)).

Chairman and CEO of Polaroid. Loading activity was not reflected on invoices, but appeared as rebates, credits, discounts, free goods, extended payment terms, and other incentives. The Company also encouraged regular customers to buy instant film with the agreement that a substantial portion of that film would be resold to another distributor that did not have a continuing relationship with Polaroid. Despite the promotional intent, renewed loading in the instant film market caused the gray market to flourish and met with customer opposition as well. Distributors were reluctant to purchase the constantly increasing amounts of film urged by Polaroid in its effort to meet sales goals. Eventually, in mid–1997, DiCamillo met with K-mart executives to address concerns about Polaroid's loading activities.

On April 16, 1996, Polaroid issued a press release announcing that estimated film sales for the first quarter of 1996 rose 10 percent and attributing the increase to "the ongoing impact of the company's more aggressive promotional efforts that began [at the end of] last year." (*Id.* ¶ 17.)

Polaroid issued a press release on January 29, 1997 announcing its financial results for the fourth quarter of 1996 and the fiscal year 1996 in which DiCamilllo stated that Polaroid "achieved solid growth in [its] core instant photography business in all areas of the world, with the exception of Russia." (*Id.* ¶ 35.)

Months later on April 16, 1997, the date the Class Period commences, Polaroid declared that its retail instant camera and film sales had shown "healthy growth" during the first quarter of fiscal 1997 due to new camera promotions and related advertising and consumer purchases. DiCamillo commented,

> [W]e are gaining confidence that our rev[a]mped advertising and promotion program is achieving its objective. . . .

> Looking out at the next three quarters, we are on track with our plan and are working diligently to achieve the 1997 profit goals we've set. We are continuing to monitor the effect of the strong U.S. dollar on our business.

(*Id.* ¶ 38.) Following the announcement, the price of Polaroid's common stock rose from $40.75 per share on April 16, 1997, to $44.3875 per share on April 18, 1997. A month later, Polaroid filed a Form 10–Q with the SEC for the first quarter of 1997, signed by CFO and Executive Vice President William J. O'Neill, in which it documented the healthy growth in its sales and earnings per share.

In the second quarter of 1997, Polaroid made a contingent sale of $16 million worth of film to CITIC, a Hong Kong-based company. Polaroid reported the transaction as a completed sale in the second quarter even though it did not receive full payment until six months later, when Polaroid employees sold all the film. Also in the second quarter of 1997, on July 17th, Polaroid reported in a press release a 14 percent increase in operating profits and a 33 percent increase in net earnings over the second quarter of 1996. Defendant DiCamillo stated that "U.S. sales growth in the second quarter was particularly encouraging." (*Id.* ¶ 42.) Polaroid share prices increased from $55.375 to $60.125 over the five days after these statements were released to the public. On August 13, 1997, Polaroid filed a Form 10–Q with the SEC for the second quarter of 1997, signed by O'Neill, in which the company confirmed the previously announced financial results and stated that the results being reported reflected "all adjustments . . . which, in the opinion of management, are necessary for a fair representation of the results of the interim period." (*Id.* ¶ 45.)

In a September 16, 1997 press release, Polaroid attributed lower earnings in the third and fourth quarters of 1997 to a stronger U.S. dollar. However, on September 26, 1997, the end of the company's third fiscal quarter, Polaroid's declining instant film sales were discussed at a staff meeting. DiCamillo allegedly instructed Daniel Hanrahan, the divisional vice president of consumer sales in the U.S., to load Polaroid's wholesalers and retailers so that the Company could meet forecasted film sales. Shortly thereafter, Polaroid engaged in substantial loading transactions with Costco and Walmart, among others.

On April 9, 1998, DiCamillo ascribed Polaroid's losses for the first quarter of 1998 to the strong U.S. dollar, the Asian economic crisis, and unexpected decline in dealers' inventory levels. However, he assured investors that "[t]he first quarter results have not altered our expectations for major improvement in our 1998 operating performance over last year." (*Id.* ¶ 54.)

Polaroid issued a press release on June 9, 1998 announcing that it anticipated a large reduction in second quarter revenue and operating profit for 1998. Defendants attributed this profit reduction to "mergers among retail drug chains and aggressive inventory controls by mass merchants." (*Id.* ¶ 57.) Then, on July 16, 1998, the Company reported a decrease in profit from $64.2 million for the second quarter of the prior year to a profit of $14.8 million for that same period in 1998. Plaintiffs state that the cause for the decline was Polaroid's inability to continue its loading activities at the same rate, because distributors were experiencing lower consumer demand for Polaroid products and could obtain the film on the gray market at cheap rates.

On August 31, 1998, an article in *Barron's* described Polaroid's problems with instant film sales, stating that "Polaroid is suffering from a serious case of product obsolescence." (*Id.* ¶ 60.) Following this publication, the price of Polaroid stock dropped 18 percent, from $34.3125 to $28.12, in one day.

## III. DISCUSSION

### A. Motion to Dismiss Standard

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) is subject to limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Under Fed.R.Civ.P. 12(b)(6), a court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan,* 961 F.2d at 988 (1st Cir.1992); *Coyne,* 972 F.2d at 442–43; *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 200 (1st Cir. 1999).

### B. Pleading Standards for § 10(b) & Rule 10b–5 Violations

Under § 10(b) and Rule 10b–5, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. "To state a *cause of action under § 10(b) and Rule 10b–5,* a plaintiff must plead, with sufficient particularity, that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this state-

ment or omission caused the plaintiff's injury." *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996).

Since a securities fraud claim is a tort claim of fraud, it is subject to the heightened pleading requirements of Fed. R.Civ.P. 9(b). *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir.1997) (citations omitted). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The particularity requirement of Rule 9(b) serves three primary purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit';[3] and (3) to safeguard defendants from frivolous charges which might damage their reputations." *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987) (footnote added).

The First Circuit has been "especially strict in demanding adherence to Rule 9(b) in the securities context . . . ." *Gross*, 93 F.3d at 991. Where an allegation of fraud is based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief. *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991). In short, a claim of fraud must "set forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223–24 (1st Cir.1996) (citations omitted).

Further heightening the pleading requirements for securities fraud claims, the PSLRA states that a plaintiff's complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In order to allege scienter adequately under the PSLRA, the complaint must, with respect to each allegedly fraudulent act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

Accordingly, under the PSLRA and Rule 9(b) case law, a mere reasonable inference of scienter is insufficient to survive a motion to dismiss: the inference must be both reasonable and strong. *Greebel*, 194 F.3d at 196–97.

In evaluating a motion to dismiss, the Court may consider documents pertinent to the action and/or referenced in the complaint. *Romani*, 929 F.2d at 879 n. 3 (considering pertinent public offering materials submitted with the defendants' motion to dismiss, even though the plaintiff did not attach a copy of the offering materials to his complaint); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir.1988) ("Although 'there is no requirement that the pleader attach a copy of the writing on which his action or defense is based[,] . . . when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading.'")

---

**3.** A strike suit occurs when "a plaintiff with a largely groundless claim [is able] to simply take up the time of a number of other people [by extensive discovery], with the right to do so representing an *in terrorem* increment of settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence . . . .". *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

(quoting 5 C. Wright & A. Miller, Federal Practice & Procedure § 1327 at 489 (1969)).

## C. Material Misstatement or Omission

To plead successfully a § 10(b) and Rule 10b–5 violation, Plaintiffs must allege that Defendants made a material misstatement or omission. "A misrepresented or omitted fact will be considered material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *Gross*, 93 F.3d at 992 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

### 1. *Loading Practices*

■ Plaintiffs assert that Polaroid's February 3, 1995 announcement that the Company would implement a dealer inventory adjustment program ("DIAP") was understood as a declaration that Polaroid would no longer engage in loading. As such, Plaintiffs argue that subsequent public statements extolling the Company's profitability, without disclosing that aggressive and extensive loading had resumed, misleadingly suggested growth based on genuine end-user demand for instant film. This, in turn, created a false image of prosperity that encouraged investors to buy and sell Polaroid securities at artificially inflated prices.

As Plaintiffs acknowledge, there is nothing inherently problematic with the practice of loading. The First Circuit in *Greebel* stated:

[Loading] means inducing purchasers to increase substantially their purchases before they would in the normal course, otherwise purchase products from the company. It has the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later

quarters. There is nothing inherently improper in pressing for sales to be made earlier than in the normal course, and [the Court] do[es] not understand plaintiffs' complaint to make any such claim.

194 F.3d at 202.

■ Here, as in *Greebel*, Plaintiffs do not attack loading as a *per se* securities fraud violation. Rather, they argue that once Polaroid announced it had stopped loading, the Company had a duty to disclose in subsequent statements that loading had resumed. The critical flaw in Plaintiffs' argument is that Polaroid never said it stopped loading. For example, the Company never stated that it would cease offering discounts to retailers at quarter end. The press release on February 3, 1995 states that "[t]he company will *target more* of its promotional efforts toward consumers to *encourage* greater demand for instant photographic products." (Compl. ¶ 24 (emphasis added).) Similarly, a June 27, 1995 press release discussing the DIAP spoke in terms of "focus[ing] on stimulating consumption of Polaroid products by businesses and consumers;" "targeting ... promotions at driving retail sales;" and "spur[ring] consumption by end-users." (*Id.* ¶ 29.) Though these press releases manifested Polaroid's intention to change its marketing emphasis to focus on consumers, these announcements did not state that Polaroid would terminate loading activity or that the Company would cease offering promotions and incentives to purchasers.

Nevertheless, Plaintiffs assert that Polaroid had a duty to explain that its loading practices had resumed, because the market understood Polaroid's statements to mean such practices previously had been terminated. To support this claim, Plaintiffs highlight a February 27, 1995 analyst report issued by Salomon Brothers Inc.

and a March 3, 1995 analyst report published by Morgan Stanley & Co., Inc. as evidence that the market understood Polaroid's DIAP announcement to mean that the Company would stop loading. The First Circuit "has not yet decided whether statements in an analyst's report may be attributable to a defendant company." *Suna*, 107 F.3d at 73. It has, however, "assum[ed] arguendo that a company may be held liable for false or misleading statements in an analyst's report where that company has adopted, endorsed, or sufficiently entangled itself with the analyst's reports . . . ." *Id.* (citing *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980)). Even if the Court assumes that such liability exists, Plaintiffs "have failed to direct [the Court] to any facts to support [their suggestion that Polaroid] endorsed the contents of [the analysts'] reports, adopted them as its own, and placed its imprimatur on them." *Id.* at 74 (internal quotation marks omitted).

At the hearing, Plaintiffs argued that Defendants still had a duty to correct the misimpression created by those reports, that loading had terminated, by disclosing that the practice was still employed. However, the First Circuit has not recognized such a broad duty to rectify incorrect statements made by analysts in the marketplace.

> By itself, . . . Rule 10b–5 does not create an affirmative duty of disclosure. Indeed, a corporation does not commit securities fraud merely by failing to disclose all nonpublic material information in its possession. The corporation must first have a duty to disclose the nonpublic material information before the potential for any liability under the securities laws emerges. Such a duty may arise if, inter alia, a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information.

*Gross*, 93 F.3d at 992 (citations omitted).

Because Polaroid was not responsible for the analysts' statements, it cannot be said that the Company "made a statement of material fact that [was] either false, inaccurate, incomplete, or misleading in light of the undisclosed information" that loading continued. *Id.* Therefore, Polaroid had no "duty to disclose the nonpublic material information" and cannot be burdened with the "liability under the securities laws." *Id.*

### 2. The Instant Film Market

■ Plaintiffs argue that various press releases and SEC filings were too rosy about Polaroid's financial health, because they failed to disclose that the market for Polaroid's instant film was in decline. Most of these allegedly misleading statements reported the financial results from prior fiscal quarters or commented about instant film and instant camera shipments and volume in quarters past. (Compl. ¶¶ 38, 40, 49, 51, 52, 54 & 58.)

With respect to statements about past fiscal quarters, the First Circuit has "consistently held that the fact that a company makes an affirmative true statement about past results does not give rise to a duty to comment on its current status." *Gross*, 93 F.3d at 994. Similarly, "if [a] defendant reported, correctly, without more, 'This is our eighth consecutive quarter in which our gross has increased,' there was no duty to add, for the benefit of market buyers, 'We are concerned about the next one.'" *Capri Optics Profit Sharing v. Digital Equip.*, 950 F.2d 5, 7–8 (1st Cir.1991). Therefore, Defendants were under no obligation to discuss the alleged instant film market decline when making factual statements about past fiscal quarters.

■ Plaintiffs point to two Polaroid press releases that commented on the impact of certain market conditions without mentioning a decline in the instant film market as well. (Compl. ¶¶ 38, 48, 52, 54, & 57.) In *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1990), the First Circuit acknowledged that "a voluntary disclosure of information that a reasonable investor would consider material must be complete and accurate." *Id.* (internal quotation marks and citation omitted). "This, however, does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'" *Id.* (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)). Statements discussing how some market factors (like mergers among retail drug chains) are affecting business are not false or misleading simply because they do not implicate other negative market influences as well.

Plaintiffs mark two forward-looking, optimistic statements about Polaroid's general business performance expectations in upcoming quarters as materially false and misleading for failing to include information about the instant film market decline. (Compl. ¶ 38 ("We are very pleased with the overall first quarter results .... [W]e continue to see business gains ... in western Europe, Australia, and Japan, in response to stronger marketing efforts there.... Looking out at the next three quarters, we are on track with our plan and are working diligently to achieve the 1997 profit goals we've set."); *Id.* ¶ 54 ("The first quarter results have not altered our expectations for major improvement in our 1998 operating performance over last year." (alteration omitted)).) Even if these statements were too puffy, it would be hard to draw a strong inference of scienter in light of the Polaroid annual reports in 1995, 1996, and 1997 where Polaroid discussed problems with the instant photography market. Polaroid 1995 Annual Report at 22 & 25 ("In 1995, U.S. shipments of instant cameras and film decreased significantly compared to 1994, primarily reflecting the impact of the dealer inventory adjustment program.... While the Company believes that emerging markets present particularly attractive opportunities, such markets tend to be considerably less stable than more established markets. There can be no assurance that emerging markets will continue to produce favorable results."); Polaroid 1996 Annual Report at 30 ("The Company anticipates that price competition from conventional film and other imaging technologies will place continued pressure on instant products.... Markets for digital imaging products are increasing rapidly and over time may erode either the growth or the absolute size of the Company's instant photography business."); Polaroid 1997 Annual Report at 27 ("While the Company believes that developing markets continue to present attractive opportunities, such markets tend to be considerably less stable than more established markets and there can be no assurance that developing markets will produce favorable results for the Company: For example, sales in both Russia and China declined substantially in 1997 compared to 1996.").

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "The 'required state of mind' for liability under section 10(b) and Rule 10b–5 is referred to as scienter, which the Supreme Court has defined as 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Greebel*, 194

F.3d at 193 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). In the First Circuit, scienter "includes a narrowly defined concept of recklessness which does not include ordinary negligence, but is closer to being a lesser form of intent." *Id.* at 188. The First Circuit "has considered many different kinds of evidence as relevant to show scienter," since the PSLRA does not mandate the adoption or rejection of any particular pattern of evidence to prove scienter. *Id.* at 188, 196. Therefore, the two forward-looking statements that Plaintiffs identify could be considered as misleading—particularly where the instant film market constitutes about 90 percent of Polaroid's business. However, any indication of scienter that one might draw from Polaroid's arguably overly optimistic statements about future business is offset by the Company's cautionary admissions in its 1995, 1996, and 1997 annual reports.

### 3. GAAP Violations

Plaintiffs claim that Defendants made materially false and misleading financial statements in violation of § 10(b) and Rule 10b–5 by improperly recognizing revenue at the end of every fiscal quarter for shipments that did not occur until a subsequent quarter; and by improperly recording revenue from consignment shipments to CITIC, a Hong Kong-based company, in the second fiscal quarter of 1997, even though no payment was due unless and until CITIC obtained payment for the products from an end-user. Plaintiffs argue that these revenue recognition practices overstated operating results for various quarters, thereby violating Generally Accepted Accounting Principles ("GAAP") and the rules and regulations of the SEC.

According to GAAP, in order to recognize immediately the revenue derived from a sale with a right of return, six conditions must be met. Statement of Financial Accounting Standards No. 48, ¶ 6. "If any of the conditions are not met at the time of the sale, sales revenue cannot be immediately recognized." *Greebel*, 194 F.3d at 203 (citing FAS 48, ¶ 6). One of the six requirements for revenue recognition to occur states that a buyer's obligation to pay the seller may not be contingent upon the resale of the product. FAS 48, ¶ 6. In light of the consignment terms of the CITIC transaction, Plaintiffs identify as potential misrepresentations or omissions the press release (Compl.¶ 42), company report (*Id.* ¶ 44), and SEC Form 10–Q (*Id.* ¶ 44) that announced Polaroid's financial results for the quarter in which the CITIC transaction was recorded.

In order to plead adequately financial fraud based on improper revenue recognition, the complaint must describe the violations at issue with sufficient particularity, setting forth such basic details as the particular transaction in which revenues were improperly recorded; the approximate amount by which revenues and earnings were overstated; the identities of the customers or employees involved in the transactions; the terms of the specific transaction; the dates of the transaction; the approximate amount of the transaction; and the products involved. *Greebel*, 194 F.3d at 204; *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 232 (D.Mass.1999). The First Circuit does not require "that each of these particulars ... appear in a complaint, but their complete absence ... is indicative of ... excessive generality [in a complaint's] allegations." *Greebel*, 194 F.3d at 204.

In addition, "a plaintiff may rely on the defendant's own disclosures about a revenue restatement to allege that previously-made statements about revenue were materially false or misleading."

*Chalverus,* 59 F.Supp.2d at 233. Pursuant to Regulation S–X, 17 CFR 210.4–01(a)(1), "[f]inancial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate . . . ." 17 CFR 210.4–01(a)(1). Accordingly, plaintiffs' allegations of fraud are based on particularized facts where they point to Polaroid's "Securities and Exchange Commission filings and press releases that disclose the restatement of the second quarter results" for 1997. *Chalverus,* 59 F.Supp.2d at 233.

■ Plaintiffs have satisfied the particularity requirement with respect to their allegations concerning the CITIC transaction in the second quarter of fiscal 1997, but Plaintiffs have failed to identify specifics regarding any other alleged transactions. Throughout the five-page section of Plaintiffs' complaint discussing "Polaroid's Materially False and Misleading Financial Statements," Plaintiffs only vaguely and summarily refer to "shipments" and "out-of-the-quarter product shipments." (Compl. at 32–37 & ¶¶ 74–75.) Because no details are provided for any transaction other than the one involving CITIC, the Court will focus solely on the CITIC transaction.

Plaintiffs allege,

[D]uring the June 30, 1997 quarter, Polaroid recognized and reported, at least, $16 million in revenue on consignment shipments to a Hong Kong-based company, CITIC. CITIC accepted delivery of the Company's film products and was not obligated to pay Polaroid for the film it received until such time that it sold the product to its customers.

(*Id.* ¶ 70.) Plaintiffs' complaint further alleges that "Polaroid did not receive payment for this shipment until the film was sold by Polaroid employees themselves later in 1997," ultimately taking "approxi-

mately six months for the CITIC film to be sold." (*Id.* ¶ 36.) Plaintiffs go on to identify some of the Polaroid employees involved with the CITIC transaction, naming Todd Masada, Polaroid's sales manager for Japan; Peter Terry, Polaroid's General manager in China; and Carol Urich, another Polaroid employee. (*Id.* ¶ 36.) Finally, Plaintiffs explain how recognition of the CITIC transaction affected the reporting of Polaroid's financial results. They state,

Polaroid reported approximately $52 million in earnings before taxes during the quarter ended June 30, 1997. Approximately $7 million (assuming only a 46% profit margin) of this amount resulted from Polaroid's improper recognition of revenue on consignment shipments to CITIC. Accordingly, Polaroid's true earnings before taxes during its 1997 second quarter of $45 million was overstated by, at least, $7 million, or approximately 15%.

(*Id.* ¶ 73.)

Thus, Plaintiffs have pleaded their securities fraud claim with respect to the CITIC transaction with great particularity, specifying the transaction and customer (CITIC); the overstatement in financial results ($7 million or 15 percent in earnings); the Polaroid employees involved (Masada, Terry, and Urich); the terms (consignment sale with payment to be received when product purchased by consumers); the time period when the transaction occurred (June 30, 1997 quarter); the amount of the transaction ($16 million); and the products involved (instant film).

In sum, the press release (*Id.* ¶ 42), company report (*Id.* ¶ 44), and SEC filing (*Id.* ¶ 45) announcing the financial results for the second quarter of 1997 constitute the only material misstatements or omissions that Plaintiff has alleged with sufficient

particularity under the pleading requirements of § 10(b) and Rule 10b–5, Fed. R.Civ.P. 9(b), and the PSLRA.

## D. Loss Causation

Defendants argue that Plaintiffs' complaint should be dismissed for its failure to allege loss causation. Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate [the securities laws] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).

The Second Circuit has further refined the loss causation analysis by parsing causation into two elements: transaction causation and loss causation. *AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202, 209 (2nd Cir.2000). "Loss causation is causation in the traditional 'proximate cause' sense—that the allegedly unlawful conduct caused the economic harm. Transaction causation means that 'the violations in question caused the [plaintiffs] to engage in the transaction in question.' " *Id.* (internal citations omitted).

At issue here is the adequacy of the allegations regarding loss causation. A plaintiff must allege "that the misstatements were the reason the transaction turned out to be a losing one." *Id.* at 215. "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were 'a substantial factor in the sequence of responsible causation' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.' " *Id.* (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2nd Cir. 1994)). In the context of GAAP violations, the Second Circuit pointed out that there was no loss causation where the concealments were "latent faults that never mani-

fested themselves." *Id.* at 215. However, if the violations fraudulently induced Plaintiffs to keep their stock, Defendants may be liable for the diminution in the value of the stock from any one of numerous causes. *Id.* at 220 (citing *David v. Belmont*, 291 Mass. 450, 453, 197 N.E. 83, 85 (1935)).

Plaintiffs claim that Defendants concealed the truth about the CITIC transaction by filing inaccurate financial statements with the SEC and recklessly or knowingly releasing unqualifiedly positive press announcements about Polaroid's earnings in the second quarter of 1997. Plaintiffs argue that Defendants should have foreseen that concealing the truth about the improper recognition of the CITIC sale so as to inflate second quarter financial results would inevitably injure Plaintiffs, who chose to buy or sell securities on the basis of Polaroid's purportedly strong financial results for the second quarter of 1997. Finally, Plaintiffs allege that the Class Period ended on Friday, August 28, 1998 and that the *Barron's* article was published the following Monday, August 31, 1998, causing stock prices to fall. The *Barron's* article described Polaroid as plagued by "flat sales and technological obsolescence." (Compl.¶ 60.)

Defendants argue that Plaintiffs fail to plead loss causation, because even though payment for the CITIC transaction was not received in the second quarter, it was received within the Class Period. Therefore, according to Defendants, the GAAP violation with regard to the CITIC sale did not ultimately misrepresent Polaroid's overall earnings for the Class Period.

To be sure, Plaintiffs adequately alleged transaction causation by pleading that they bought or sold securities at inflated prices on the basis of rosy and false statements about the second quarter of 1997. After

all, following Polaroid's July 17, 1997 press release announcing the second quarter financial results, the price of Polaroid common stock rose from $55.375 per share on July 17, 1997 to $60.125 per share on July 22, 1997. However, Plaintiffs fail to allege that this GAAP violation was a substantial factor in the decline of the stock price, and no such inference is appropriate because this latent problem dissipated as soon as the income was received. Accordingly, I conclude that the Complaint fails to allege adequate loss causation.

## IV. ORDER

Defendants' Motion to Dismiss the Consolidated Amended Complaint (Docket # 25) is hereby **ALLOWED**.