In Re Tyco Int'l Ltd. Securities    MDL-00-1335-B    02/22/02   P
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


In re Tyco International, Ltd.,
Securities Litigation

                                    MDL Docket No. 00-1335-B
                                    ALL CASES

                                    Opinion NO. 2002 DNH 053

MEMORANDUM AND ORDER


     The plaintiffs in this securities fraud class action contend that, from October 1, 1998 through December 8, 1999 ("the Class Period"), defendant Tyco International Ltd., acting under the control, at the behest, or with the knowledge of individually named defendants Michael A. Ashcroft, Mark A. Belnick, L. Dennis Kozlowski, Robert P. Mead, and Mark H. Swartz, artificially inflated the price of Tyco's stock by misleadingly promoting Tyco as a "turn-around" specialist able to acquire and then wring profits from underperforming companies.  In their second amended complaint, plaintiffs elaborate upon this contention by complaining of the existence of a Class Period scheme whereby defendants issued false and misleadingly positive public

statements about Tyco's earnings-growth capacity (and the earnings-growth capacity of two companies Tyco acquired during the Class Period) while falsely "substantiating" the statements in Tyco's public financial reports by (1) causing the two, soon-to-be-acquired companies to overstate certain merger-related accounting reserves prior to the mergers, thereby making the earnings stated in the post-merger quarters look good by comparison to the pre-merger quarters; and (2) reversing the intentionally overstated reserves following the mergers, thereby making the earnings stated in the post-merger quarters look exceptionally good by comparison to the pre-merger quarters. Plaintiffs assert three claims for relief under §§ 10(b), 20(a) and 20A of the Securities and Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The Farmers Company, representing a subgroup of plaintiffs holding shares in one of the acquired companies prior to its merger with Tyco, also asserts three claims for relief under §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

Defendants have moved to dismiss the second amended complaint, arguing, _inter_ _alia_, that the Exchange Act claims fail to satisfy applicable pleading standards supplied by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), and that the 1933 Act claims are barred by the Act's one-year statute of limitations.  I agree and grant defendants' motion.

## I.  BACKGROUND

At the outset, I wish to be clear about the nature of the record on which the ensuing discussion is predicated.  First, in the second amended complaint, plaintiffs expressly rely on, and often quote directly from, a number of publicly available documents, such as press releases and SEC filings.  Defendants have provided complete copies of many of those documents, and plaintiffs have not challenged their authenticity.  Accordingly, the documents effectively merge into the pleadings, and I shall rely upon them for purposes of explicating the allegations in the second amended complaint without converting the motion to dismiss into one for summary judgment.  _Beddall v. State Street Bank & Trust Co._, 137 F.3d 12, 17 (1st Cir. 1998); _Shaw v. Digital_

<u>Equip. Corp.</u>, 82 F.3d 1194, 1220 (1st Cir. 1996).

Second, at the November 20, 2001 hearing on the motion to dismiss, I asked plaintiffs to submit a chart, <u>keyed to the second amended complaint</u>, (1) detailing the specific statements plaintiffs regard as false and misleading; and (2) explaining why the statements are misleading. In doing so, I stated that my request was prompted by a desire to understand the nature of the fraud that had been alleged, and that I was not inviting plaintiffs to assert new arguments or to supply additional factual detail.

In response, plaintiffs filed a chart, spanning a total of 162 pages, containing numerous bracketed "examples" of alleged accounting malfeasance ostensibly designed to illuminate plaintiffs' generally stated allegation that defendants caused two acquired companies to overstate unspecified reserves prior to the mergers and then reversed those reserves post-mergers in order to create, with respect to each company, the appearance of a pronounced bottom-line turn around. <u>See</u> Document No. 67. These examples consist of a number of detailed argumentative allegations that, as shall be apparent from my discussion <u>infra</u>, should have been pleaded but were not. The passages are, in

-4-

other words, an untimely effort to supply the specificity that is necessary to sustain a viable securities fraud complaint.

Defendants have not had an opportunity to respond in detail to these allegations, and it would be unfair to require them to do so now for three reasons: (1) plaintiffs have already had three opportunities to plead with sufficient particularity to withstand a Fed. R. Civ. P. 12(b)(6) motion, but have fallen well short of stating a viable securities fraud claim on each occasion; (2) plaintiffs do not adequately explain how the allegations in the bracketed passages are reasonably inferred from the Tyco financial statements upon which they are based; and (3) my review of the financial statements on which the allegations in the bracketed passages are based does not suggest that the inferences drawn are reasonable. I therefore shall not regard the argumentative allegations set forth in the bracketed passages to be incorporated within the second amended complaint, and shall limit my recitation of the background of this case to the factual and argumentative allegations actually made in or fairly implied by that pleading.

## A. Historical Facts

Tyco manufactures a broad array of products, e.g., fire

protection systems, and provides services directly to consumers, e.g., electronic security services. Tyco's common stock is actively traded on the New York Stock Exchange under the ticker symbol "TYC."

Since 1992, Tyco has acquired hundreds of companies and/or product lines. As a result of its financial performance after these acquisitions, Tyco developed a reputation as a "turn around specialist," i.e., a company that can dramatically increase the profitability of the companies that it acquires. This case concerns two acquisitions Tyco made in 1998 and 1999.

## 1. The Acquisition of USSC

On May 25, 1998, Tyco entered into an agreement with United States Surgical Corporation ("USSC") pursuant to which USSC would merge into a Tyco subsidiary. As part of the agreement, Tyco assumed $587 million of USSC's debt and gave USSC's shareholders 0.76 of a share of Tyco common stock for each share of USSC stock that they held. The acquisition, which was accounted for as a pooling of interests,[1] was to become effective as of October 1,

---

[1] A pooling of interests is a "method of accounting for mergers in which the acquired company's assets are recorded on the acquiring company's books at their cost when originally acquired. No goodwill is created under the pooling method."

1998 and was valued at approximately $3.9 billion.

On July 29, 1998, USSC filed a Form 10-Q with the Securities and Exchange Commission (the "SEC"). In this 10-Q, USSC's last quarterly statement prior to the effective date of the acquisition, USSC stated that its net income for the quarter ended June 30, 1998 had been $29 million, an increase of 37% over the same quarter in 1997. In addition, USSC reported that it had achieved a net income of $69 million during the nine-month period ended June 30, 1998.

On October 1, 1998, the effective date of Tyco's acquisition of USSC, Tyco issued a press release stating that the acquisition would provide "great opportunities for revenue growth and an immediate bottom-line impact." But in a Form 8-K filed with the SEC on December 10, 1998, Tyco reported that USSC had in fact experienced a net loss of $212 million for the year ended September 30, 1998.

On April 20, 1999, Tyco announced that its healthcare products division, of which USSC was now a part, had achieved earnings of $322.5 million for the quarter ended March 31, 1999.

_____

Black's Law Dictionary 1161 (6th ed. 1990).

-7-

This represented an increase of 69% from the same quarter in 1998. In a press release, Tyco attributed much of this increase to the acquisition and successful integration of USSC: "The integration of [USSC] into the Tyco Healthcare Group continues to be ahead of schedule leading to increased margins this quarter."

### 2. The Acquisition of AMP

On November 23, 1998, Tyco announced that it had reached an agreement with AMP, Inc. ("AMP"), pursuant to which AMP would merge with a Tyco subsidiary and each AMP shareholder would receive 0.7839 of a share of Tyco common stock in exchange for each of their AMP shares. This transaction, valued at $11.3 billion and accounted for as a pooling of interests, was Tyco's largest acquisition to that point. The deal was expected to be completed in the spring of 1999.

In a press release announcing the acquisition, defendant L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer, stated:

> The combination with Tyco provides AMP a clear path to becoming the lowest cost manufacturer, while providing attractive margin improvement resulting in double-digit earnings growth and strong cash flows for the foreseeable future . . . . The transaction

> will provide an immediate positive earnings
> contribution to our shareholders.

In meetings with securities analysts, Kozlowski predicted that the acquisition of AMP would add twelve cents per share to Tyco's profits for the fiscal year ended September 30, 1999, thirty-five to forty cents per share for the 2000 fiscal year, and fifty to sixty cents per share for the 2001 fiscal year.

On January 29, 1999, AMP announced its financial results for the quarter ended December 31, 1998. Although AMP's operating income had increased, the company reported a net loss of $79 million for the quarter, after incurring: (1) $154 million ($228 million before taxes) in charges stemming from its "Profit Improvement Plan" (the "AMP Plan"); (2) $17 million ($26 million before taxes) in expenses related to its defense against a hostile takeover bid; and (3) $15 million ($22 million before taxes) in non-refundable bank fees related to AMP's canceled offer to repurchase 30 million shares of its own stock.

According to AMP's press release, the company, pursuant to the AMP Plan, expected to close twenty-seven manufacturing plants and twenty-six administrative facilities worldwide during 1998 and 1999, resulting in the discharge or retirement of

approximately 4,200 employees. The accounting reserve established under the AMP Plan included funds set aside to cover future expenses related to the proposed workforce reductions, facility closings, divestitures, and fixed-asset adjustments.

On March 26, 1999, AMP filed with the SEC its final Form 10-K, covering the fiscal year ended December 31, 1998. AMP reported that it had taken a total of $376.7 million in charges in connection with the AMP Plan. Those charges included (1) a $126.8 million charge related to the proposed closure and/or consolidation of fifty-three facilities, e.g., write-downs of fixed assets and inventories; and (2) a $249.9 million reserve related to the proposed discharge or retirement of approximately 6,450 employees.

On April 2, 1999, Tyco issued a press release announcing the completion of its acquisition of AMP. In this press release, Kozlowski stated that Tyco "expect[s] to see significant margin improvement, double digit earnings growth and strong cash flows for the foreseeable future."

On June 3, 1999, Tyco filed a Form 8-K with the SEC in which it reported that AMP had incurred a $376 million net loss for the six months ended March 31, 1999. Tyco reported that AMP, in

connection with the AMP Plan, had recorded: (1) additional restructuring charges of $374.2 million during the first six months of 1999, primarily related to severance and closure of facilities; and (2) charges of $67.6 million for the impairment of long-lived assets. In addition, AMP had incurred $31.9 million in transaction costs related to its acquisition by Tyco.

On July 20, 1999, Tyco issued a press release announcing that its earnings for the quarter ended June 30, 1999 had increased over 71% compared with the prior year's corresponding quarter. Moreover, Kozlowski stated that Tyco remains "excited about the sales growth and earnings contribution to be provided by the [acquisition of] AMP . . . . The [projected] savings [from the acquisition of AMP] were achieved earlier and were greater than initially estimated, with revenues also stronger than originally forecasted."

Shortly thereafter, between July 27 and July 30, 1999, Kozlowski sold over three million shares of Tyco stock, receiving over $160 million in proceeds. During that same time period, defendant Michael A. Ashcroft, a Tyco director, sold 413,700 shares of Tyco stock, receiving proceeds of $20,848,412. Ashcroft and Kozlowski sold their shares at prices ranging from

$45.25 to $50.39 per share.[2]  These sale prices represented a marked increase from $26.9308, the opening price of Tyco's shares on October 1, 1998, the first day of the Class Period.

Between September 23 and October 18, 1999, Kozlowski, defendant Mark Swartz, Tyco's Chief Financial Officer, defendant Mark Belnick, Tyco's Executive Vice President, and defendant Robert Mead, President of Tyco's flow control products group, sold additional Tyco shares and received aggregate proceeds in the millions of dollars.  The sale prices of these shares ranged from $40.18 to $51.50 per share.

### 3.   The Tice Report, the Norris Article and the SEC investigation

On October 13, 1999, David W. Tice, a fund manager, published an article (the "Tice Report") in his newsletter in which he expressed skepticism about Tyco's accounting practices. Tice questioned Tyco's use of the pooling of interests method of accounting and expressed concern that Tyco's earnings statements failed to paint an accurate picture of the company's true earnings because "pooling of interest accounting and adept use of

---

[2]All Tyco share prices quoted herein have been adjusted to reflect stock splits.

'cookie jar' reserves," which Tice regarded as excessive, were permitting Tyco "to keep the illusion of margin expansion and growth alive."  As a result of the speculation caused by Tice's comments, Tyco's share price fell that day from an opening price of $51.1798 per share to a closing price of $48.4335 per share.

As other media outlets began to run stories about the Tice Report, Tyco denied Tice's allegations in a series of press releases, media interviews by Kozlowski, and conference calls with securities analysts.  Tyco's share price continued to decline, closing at $40.9126 on October 18, 1999.

On October 21, 1999, in the midst of this speculation, Tyco released its results for the fourth quarter and fiscal year ended September 30, 1999.[3]  Tyco reported that its income for the quarter and the fiscal year had increased significantly from that reported for the quarter and fiscal year ended September 30, 1998.

On October 29, 1999, The New York Times published an article by Floyd Norris regarding Tyco's accounting practices.  After noting that Tyco has a strong reputation for improving the

---

[3]Tyco operates on an October – September fiscal year.

-13-

operations of companies that it acquires, Norris stated that both

AMP and USSC

> took big losses just before the acquisitions
> closed as sales dropped sharply and expenses
> soared.  Those losses were, however, never
> reported to investors.  By the time the reports
> would have been due, the acquisitions had been
> completed.

> "They aren't disclosed clearly," Mark
> Swartz, Tyco's chief financial officer
> acknowledged . . . .  But he said, rightly,
> that an investor could get at them by doing a
> little arithmetic involving filings with the
> Securities and Exchange Commission . . . .

> It turns out that [USSC] took a $190
> million write-off to lower its asset values
> just before the deal closed.  That will help
> in two ways.  First, it makes the comparison
> with future quarters easy.  Second, it will
> help profits by reducing depreciation
> charges.  But nowhere was that disclosed in
> SEC filings.

> Such accounting . . . helps explain "why
> these low-growth or no-growth businesses show
> great growth coming out of the box" after
> they are acquired by Tyco.

Tyco subsequently denied that it had failed to disclose any

losses.

On December 9, 1999, Tyco announced that the SEC was

conducting an informal inquiry "relating to charges and reserves

taken in connection with the company's acquisitions."  Tyco's

-14-

share price closed that day at $28.2113.

On June 26, 2000, Tyco filed restatements of its quarterly statements for the quarters ended December 31, 1998 and March 31, 1999, as well as a restatement of its Form 10-K for the fiscal year ended September 30, 1999 (which reflected the amendments to the first two quarterly statements for that fiscal year).[4] These amended filings modified the original filings in a number of ways. In their second amended complaint, plaintiffs identified the following modifications to the December 31, 1998 quarterly statement as relevant to their case theory: (1) the amended 10-Q restated nonrecurring charges and charges for the impairment of long-lived assets from $679 million to $639 million, a decrease of 6%; (2) the amended 10-Q restated operating income from $49.1 million to $74.4 million, an increase of 51%; and (3) the amended 10-Q restated reported net loss from $110 million to $92 million, a decrease of 16.4%. Tyco's share price rose upon the filing of

_____

[4]At the same time, Tyco also filed restatements of its financial results for the quarters ending December 31, 1999 and March 31, 2000. As defendants point out, without contradiction from plaintiffs, the original quarterly statements for these two quarters (as well as the original Form 10-K filed for the fiscal year ended September 30, 1999) were filed after the close of the Class Period, and therefore could not themselves have contained actionable misstatements.

these restatements.

On July 13, 2000, the SEC informed Tyco that it had "completed its investigation and that at this time no enforcement action has been recommended to the" SEC by its staff.

## B.   Procedural History

Following the announcement that the SEC was conducting an informal inquiry into Tyco's accounting practices, a number of individual Tyco shareholders filed suit against Tyco in federal district courts throughout the country, alleging that Tyco's public statements and accounting practices violated federal securities laws.  On April 26, 2000, the Judicial Panel on Multidistrict Litigation transferred these actions to this court for consolidated pretrial proceedings in accordance with 28 U.S.C. § 1407.

On August 17, 2000, I issued a Memorandum and Order appointing a group of three shareholders (the "Tyco Shareholder Group" or the "TSG") as the lead plaintiff in the consolidated actions and approving its choice of lead counsel.  See Tyco International, Ltd. Sec. Litig., 2000 DNH 182 (Aug. 17, 2000). The TSG filed its second amended complaint on November 2, 2000.

In the six-count second amended complaint, the TSG asserts a

-16-

number of claims on behalf of itself and all other persons who purchased Tyco stock between October 1, 1998 and December 8, 1999. In Count I, the TSG alleges that Tyco, Kozlowski, Ashcroft, Belnick, Mead, and Swartz violated § 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder, by defrauding the market through a series of material misrepresentations about Tyco, its acquisitions, and its accounting practices. In Counts II and III, the TSG alleges that Kozlowski, Ashcroft, Belnick, Mead, and Swartz violated §§ 20(a) and 20A of the Exchange Act by virtue of their control of Tyco and their sale of Tyco shares while in the possession of material, non-public information. In Counts IV-VI, the Farmers Company alleges, on behalf of itself and other former shareholders of AMP whose shares were converted into Tyco shares, that certain of the named defendants violated §§ 11, 12(a)(2), and 15 of the 1933 Act by making a number of material misstatements in the registration statement and prospectus sent out in February 1999 to announce the April 1, 1999 special meeting of shareholders held to vote on Tyco's proposed acquisition of AMP.

## II. <u>DISCUSSION</u>

## A. The Exchange Act Claims

Defendants have moved to dismiss Counts I-III pursuant to Fed. R. Civ. P. 12(b)(6). Their principal contention, and the only argument I address with respect to these claims, is that the claims do not pass muster under the PSLRA's stringent pleading requirements.

As with any motion to dismiss a claim filed pursuant to Fed. R. Civ. P. 12(b)(6), I accept as true all well-pleaded facts in support of the claim. <u>E.g.</u>, <u>Blackstone Realty LLC v. Fed. Deposit Ins. Corp.</u>, 244 F.3d 193, 197 (1st Cir. 2001). But because Counts I-III are subject to the rigorous pleading strictures of the PSLRA, the more meaningful aspects of the applicable standard of review derive from that statute.

Congress enacted the PSLRA in 1995 as an amendment to the Exchange Act in an attempt to "deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." <u>Novak v. Kasaks</u>, 216 F.3d 300, 306 (2d Cir. 2000), <u>cert. denied</u>, 531 U.S. 1012; <u>see also</u> <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d

185, 191 (1st Cir. 1999). In furtherance of that goal, the PSLRA imposes strict pleading standards on plaintiffs asserting claims for securities fraud under the Exchange Act and Rule 10b-5. 15 U.S.C. § 78u-4(b)(1)-(2); see Greebel, 194 F.3d at 196 n.9 ("In the guise of tinkering with procedural requirements, Congress has effectively, for policy reasons, made it substantively harder for plaintiffs to bring securities fraud cases.").

The PSLRA mandates that a complaint asserting securities fraud pursuant to the Exchange Act and Rule 10b-5 must (1) "specify each statement alleged to have been misleading;" (2) specify "the reason or reasons why the statement is misleading;" and (3) "if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). These requirements are not relaxed even when "the fraud relates to matters peculiarly within the knowledge of the opposing party." Greebel, 194 F.3d at 193 (quoting Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985) (applying the Fed. R. Civ. P. 9(b) pleading standards – which the First Circuit regards as "congruent and consistent" with the PSLRA – in effect prior to the passage of the PSLRA)) (internal quotation marks omitted).

-19-

The PSLRA also imposes an additional pleading requirement related to the scienter, or the state of mind, required for liability under the Exchange Act and Rule 10b-5. See 15 U.S.C. § 78u-4(b)(2) (mandating that the complaint state with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, that defendants acted with "intent to deceive, manipulate, or defraud," Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976)). While the First Circuit has long eschewed "categoriz[ing] patterns of facts as acceptable or unacceptable" to demonstrate scienter, Greebel, 194 F.3d at 196, and continues to apply its case-specific approach under the PSLRA, id. (summarizing the types of evidence that Circuit has accepted as sufficient to establish Exchange Act scienter), it has emphasized that the statutory "strong inference" standard requires more than an unadorned allegation that defendants had the motive and an opportunity to make false or misleading statements, id. at 197 (declining to hold that "facts showing motive and opportunity can never be enough to permit the drawing of a strong inference of scienter," but cautioning that "catch-all allegations that defendants stood to benefit from wrongdoing and had the

-20-

opportunity to implement a fraudulent scheme are not sufficient")
(citation and internal quotation marks omitted).

The TSG identifies twenty-five allegedly misleading
statements in its second amended complaint.  These statements may
be roughly divided into the following six categories:  (1)
statements regarding Tyco's "turn around" business strategy made
by Tyco in its public financial statements; (2) statements
regarding Tyco's "turn around" business strategy made by
Kozlowski to the press or at public functions; (3) statements to
the press, by Kozlowski or unnamed company representatives,
predicting future earnings growth at Tyco as a result of the USSC
and AMP mergers; (4) summaries of Tyco's bottom-line performance
periodically released to the press by unnamed Tyco representa-
tives at or around the time of the USSC and AMP mergers; (5)
earnings reports made by Tyco in its public financial statements
at or near the time of the USSC and AMP mergers; and (6)
statements to the press and industry analysts made by Kozlowski,
Swartz, and unnamed others responding to the Tice Report and
denying any impropriety.  I shall assume arguendo that, by
pointing to these twenty-five statements, the TSG has
sufficiently identified the statements which it claims were

-21-

misleading.

The TSG has not, however, satisfied the PSLRA's remaining pleading requirements. As defendants point out without any real contradiction from the TSG, the identified statements are misleading within the meaning of the Exchange Act and Rule 10b-5 only to the extent that the underlying fraud claim – the claimed scheme whereby defendants, on information and belief, knowingly caused USSC and AMP to overstate merger-related reserves[5] – is viable. Because the PSLRA requires particularized pleading of "the reason or reasons why the statement[s are] misleading" and "all facts on which th[e] belief [that the statements are misleading and were made with the requisite state of mind] is formed," 15 U.S.C. § 78u-4(b)(1), defendants are entitled to dismissal of the second amended complaint unless the TSG has

---

[5]As noted <u>supra</u> at 1-2, plaintiffs also allege that, as part of the scheme, Tyco reversed overstated reserves and thereby padded its earnings post-merger. But the subsequent reversal of reserves is not a necessary component of the fraud plaintiffs have alleged, as the mere overstatement of reserves pre-merger would make ensuing quarters look good by comparison (if plaintiffs' fraud theory is to be believed). I thus confine my analysis to whether plaintiffs have sufficiently alleged that which is absolutely necessary to the viability of their Exchange Act claims: that Tyco caused USSC and AMP knowingly to overstate merger-related reserves prior to the mergers.

pleaded with sufficient particularity the facts which substantiate its asserted belief that Tyco and the individual defendants, acting with an intent to deceive, manipulate, or defraud, see Hochfelder, 425 U.S. at 193, caused USSC and AMP to overstate merger-related reserves prior to their mergers into Tyco. The second amended complaint is deficient because it fails to satisfy this requirement.

Generously construed, the TSG's submissions identify four groups of allegations as supporting and explaining its conclusion that Tyco and the individual defendants violated the Exchange Act and Rule 10b-5: (1) allegations involving insider trading; (2) allegations involving Tyco's restatements of certain of its 1999 and 2000 fiscal year financial statements; (3) allegations that USSC and AMP reported large losses in the quarters prior to the mergers which starkly contrasted with the companies' positive bottom-line numbers in earlier reporting periods; and (4) allegations from unidentified sources, discussed infra, pertaining to reserves taken in connection with the AMP merger. When viewed through the lens provided by the PSLRA, these allegations do not support the conclusion that the TSG has drawn.

As in <u>Greebel</u>, the allegations of insider trading in this case do not involve "the more common scenario" in which a group of plaintiffs asserts that defendants capitalized on "undisclosed knowledge of a single big event or big news." 194 F.3d at 197 n.10. Rather, the allegations here concern "the creation of 'incentives for insiders to disseminate false information about the firm so that they can profit by buying and selling mispriced securities.'" <u>Id.</u> (quoting F. Easterbrook & D. Fischel, <u>The Economic Structure of Corporate Law</u> 254 (1991)). In such cases, unexplained evidence of insider trading may suggest that admittedly misleading prior statements were made with scienter, <u>see, e.g.</u>, <u>Geffon v. Micron Corp.</u>, 249 F.3d 29, 36 (1st Cir. 2001), but insider trading is of limited, if any, value in determining whether allegedly true prior statements are, in fact, misleading.[6] The TSG's allegations of insider trading thus raise

_____

[6]The TSG argues that large stock sales by insiders shortly after the release of positive accounting information suggests that the information is misleading because it demonstrates that the insiders lack confidence in the accuracy of the information. This argument overlooks the fact that most publicly traded companies have adopted policies which prevent insiders from trading except during narrow windows that are open for only brief periods following the release of accounting information. <u>See</u> J.C. Bettis, et al., <u>Corporate Policies Restricting Trading by Insiders</u>, 57 J. Fin. Econ. 191, 218 (2000). Given this reality,

questions under the Exchange Act and Rule 10b-5 only to the extent that the TSG has otherwise sufficiently identified the facts supporting its belief that the statements on which it bases its claims are misleading.

The TSG's allegations about Tyco's 2000 restatements likewise fail to support its belief that the statements on which its claims are based are misleading. Despite having been afforded ample opportunity to do so, the TSG has failed to respond to defendants' argument, presented in both their motion to dismiss and reply memorandum in support thereof, that the restatements do <u>not</u> support the TSG's fraud theory because (1) three of the restatements amend statements originally filed after the close of the Class Period, <u>see</u> <u>supra</u> n.4; (2) the restatement covering the quarter ended March 31, 1999 merely reclassified certain expenses from one category of non-recurring expense to another and had no effect on earnings per share for the quarter; and (3) the restatement covering the quarter ended December 31,

---

evidence of insider trading following the release of accounting information is of limited value in determining whether the released information is misleading in most cases because it is equally likely that the information is accurate and that the timing of the trades is dictated by the company's insider trading policy.

1998, the quarter <u>after</u> the USSC merger, actually <u>reduced charges</u> taken in that quarter and thereby <u>increased</u> earnings per share at a time when, if the TSG's allegations are to be believed, earnings per share were originally reported as being too high. Nor, for that matter, has the TSG presented a coherent explanation linking the restatements to <u>the fraud alleged in this case</u>.[7] As the existence of any such link is far from self-evident, these omissions are fatal to any restatements-based theory of liability.

With the limited relevance of the insider trading and restatements allegations laid bare, not much is left to support the TSG's Exchange Act claims. The only additional facts pleaded by the TSG which both directly relate to its fraud theory and involve USSC concern its claim that USSC reported $69 million in net income for the three quarters ended June 30, 1998, but Tyco later reported that USSC had suffered a net loss of $212 million

---

[7]The TSG repeatedly asserts that, under applicable accounting principles, a restatement is a <u>per se</u> admission that the original financial statement contained a material falsehood actionable under federal securities laws. But even if I assume <u>arguendo</u> that this is so, the TSG must offer <u>some</u> basis for linking the material falsehood to the fraud theory being pressed in this litigation. The TSG has not provided me with such a basis.

for the fiscal year ended September 30, 1998.  The TSG infers from the magnitude of USSC's reversal of fortune in the period between June 30 and September 30, 1998 that Tyco must have been causing USSC to overstate its pre-merger reserves.[8]  This inference is unduly speculative.  But even if it were not, the allegation is defective under the PSLRA because the TSG has failed to identify any particular USSC reserve that was overstated or to specify "the amount of the putative overstatement."[9]  Gross v. Summa Four, Inc., 93 F.3d 987, 996 (1st Cir. 1996) (affirming dismissal of securities fraud claim in part based on a claimed reserve overstatement because the complaint failed to allege the amount of the overstatement or the net effect it had on the company's earnings) (applying Fed. R.

---

[8]I note, however, that USSC warned investors on June 28, 1998 that it had been "recently informed that several of [its] distributors plan[ned] to lower their inventory levels of [USSC's] products throughout the remainder of 1998 . . . [and that] [t]he impact on sales of this inventory reduction for the remainder of the year cannot be determined presently."  USSC Form 10-Q dated July 28, 1998.

[9]The second amended complaint quotes from the Norris article, in which Norris states that USSC "took a $190 million write-off to lower its values just before" it was acquired by Tyco.  Second Amended Complaint at ¶ 111.  The TSG, however, never asserts that this write-off was improper.

Civ. P. 9(b)); see In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d 251, 268-69 (D. Mass. 2001) (similar); Van Ormer v. Aspen Technology, Inc., 145 F. Supp. 2d 101, 105 (D. Mass. 2000) (similar); cf., e.g., In re Polaroid Corp. Sec. Litig., 134 F. Supp. 2d 176, 187 (D. Mass. 2001) (denying motion to dismiss where the complaint specified the amount of the company's reported earnings which resulted from improper revenue recognition and provided details of the transactions involved).

The TSG's allegations concerning whether Tyco caused AMP to overstate merger-related reserves are similarly lacking in specificity. Here again, the TSG fails to claim that any particular reserve is overstated or to plead the amount of any putative overstatement.[10] To be sure, the TSG does allege that,

---

[10]In the second amended complaint, the TSG implies that AMP overstated a $376.7 million reserve taken for employee termination benefits in the fourth quarter of the fiscal year ended December 31, 1998. In support of this implication, the TSG notes that, as of December 31, 1998, 63.5% of the contemplated terminations had been effectuated, but only 28% of the reserve had been paid out. But the TSG stops short of actually alleging that the reserve was intentionally overstated or specifying the extent to which the reserve was overstated. Nor did the TSG present any argument at the November 20, 2001 hearing responsive to defendants' contention that the allegation is itself misleading because the document on which it is based makes clear that nearly half of the reserve was allocated to future pension payments for terminated employees.

-28-

during the period between the date on which Tyco and AMP agreed to merge and the date on which the merger occurred, Tyco (1) formed a team to "coordinate restructuring of AMP's operations, directed AMP's preparation of financial statements and caused it to write down assets on AMP's books," including assets that were still in use, Second Amended Complaint at ¶ 64; and (2) "instructed AMP employees to make lists of potential liabilities that could arise under 'every possible scenario' and establish reserves for 'anything that can happen at all' and that their attitude should be 'we will reserve for "this" and if it turns out that we do not need it for "this," there will probably be something else we missed that we can use it for,'" id. at ¶ 65. But even these allegations lack the supportive detail required by the PSLRA.

The only specific fraudulent activity identified in either of these paragraphs is that "Tyco caused . . . computer equipment worth millions of dollars, to be written off in its entirety even though it continued in use." Id. at ¶ 64. Yet even as to this alleged fraud, the second amended complaint does not provide sufficient details as to where or when the fraud occurred. Nor does it identify the source of the information. See 15 U.S.C. §

-29-

78u-4(b)(1) ("the complaint shall state with particularity all facts on which [the plaintiffs'] belief is formed"); Gross, 93 F.3d at 991 ("particular times, dates, places, or other details of the alleged fraudulent involvement of the actors [must] be alleged") (citations and internal quotation marks omitted). Finally, the TSG does not explain how Tyco induced AMP employees to acquiesce to this fraud or identify which AMP employees were involved. See Suna v. Bailey Corp., 107 F.3d 64, 73-74 (1st Cir. 1997) (holding that, where a plaintiff alleges that the defendant should be held liable for the misrepresentations of a third party, he must plead with particularity those statements made by the defendant to the third party which induced him or her to make the misrepresentations) (applying Fed. R. Civ. P. 9(b)); Hayduk, 775 F.2d at 444 ("mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated").

The second amended complaint also fails either to name the former Tyco employees who provided the TSG with the few relevant allegations that do appear in the pleading, see, e.g., In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 942-43 (E.D. Pa. 1999) (holding that the PSLRA requires plaintiffs to name confidential sources); In re Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746, 763-64 (N.D. Cal. 1997) (same), or to detail their responsibilities at the company, see Novak, 216 F.3d at 312-14 (holding that sources need not be named "provided they are described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").[11] Thus, the allegations derived from confidential sources in this case are deficient even if I assume arguendo that confidential informants need not be named if they are described in such detail as to allow for an

_____

[11]For example, the TSG alleges that "a former Tyco accountant stated that his supervisor was discharged because of his unwillingness to comply with what he considered to be unethical requests to take excessive write downs and others said Tyco bullied them into accounting practices that made them uncomfortable." Second Amended Complaint at ¶ 63. But it does not identify this accountant as the source of the information regarding Tyco's interactions with AMP, instead referring to these sources only as other "former employee[s]." Id. at ¶ 64.

inference that they possessed the information alleged. Compare Van Ormer, 145 F. Supp. 2d at 105 ("Allegations supported only by unidentified 'sales managers' who got their information from unspecified sources fall woefully short of meeting particularity requirements."), with Fitzer v. Security Dynamics Tech., Inc., 119 F. Supp. 2d 12, 21-22 (D. Mass. 2000) (holding that the PSLRA's requirements were met where the plaintiff identified the source of her information as including former employees "who handled returns," or were "in the technical support department" or were "responsible for strategic planning").

Finally, the TSG fails to plead specific facts about the role of each defendant in the alleged fraud. See Suna, 107 F.3d at 73-74; Gross, 93 F.3d at 991; Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994) (applying Fed. R. Civ. P. 9(b)); see generally 2 James Wm. Moore, et al., Moore's Federal Practice § 9.03[1][f] (3d ed. 2001) ("If a claim involves multiple defending parties, a claimant usually may not group all wrongdoers together in a single set of allegations. Rather, the claimant is required to make specific and separate allegations against each defendant."); cf., e.g., In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 595-96 (D.N.J. 2001) (holding

that plaintiffs satisfied the PSLRA where their complaint specified "discussions, phone conversations, and memoranda addressing the basis of Plaintiffs' factual allegations and identifie[d] numerous individuals who participated in those communications, as well as their positions in the Company"). Absent specific factual allegations linking specific defendants with the preparation of AMP's allegedly false financial statements prior to completion of Tyco's acquisition of AMP, defendants cannot be said to have necessarily participated in such activities simply because they were in positions of authority at Tyco. Compare Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998) (applying Fed. R. Civ. P. 9(b)); Suna, 107 F.3d at 73-74; and Raab v. General Physics Corp., 4 F.3d 286, 288-89 (4th Cir. 1993) (holding that plaintiffs had failed to plead sufficient facts to support an inference that the defendants exercised control over a security analyst's report) (applying Fed. R. Civ. P. 9(b)), with Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir. 1980) ("a company may so involve itself in the preparation of reports . . . [by third parties] as to assume a duty to correct material errors" in those reports) (applying Fed. R. Civ. P. 9(b)); Schaffer v. Timberland Co., 924

F. Supp. 1298, 1310-12 (D.N.H. 1996) (concluding that the plaintiffs had pleaded sufficient facts to demonstrate that the defendants were "sufficiently entangled with" statements made by securities analysts to be held liable for statements made by those analysts)(applying Fed. R. Civ. P. 9(b)).

The TSG has based its Exchange Act claims on its belief that Tyco and the individual defendants participated in a fraudulent scheme to cause AMP and USSC to overstate reserves prior to their mergers with Tyco. Whether a complaint founded on such a belief can survive the PSLRA's particularity requirements depends upon whether the belief is supportable in light of the totality of the facts specifically pleaded in the complaint. The complaint at issue here fails to satisfy this test. Accordingly, I grant defendants' motion to dismiss the TSG's Exchange Act claims.

## B. The 1933 Act Claims

Defendants argue that the Farmers Company's 1933 Act claims must be dismissed because they are barred by the Act's one-year statute of limitations. I agree.

The 1933 Act's statute of limitations provides in pertinent part that claims under the Act must be "brought within one year after the discovery of the untrue statement or the omission or

after such discovery should have been made by the exercise of reasonable diligence . . . ." 15 U.S.C. § 77m.[12] A plaintiff is on inquiry notice of a potential cause of action under the Act when it becomes aware of "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale." Kennedy v. Josephthal & Co., Inc., 814 F.2d 798, 802 (1st Cir. 1987) (quoting Cook v. Avien, Inc., 573 F.2d 685, 697-698 (1st Cir. 1978)). When storm warnings suggest the possibility of a cause of action, the plaintiff must exercise reasonable diligence in attempting to uncover it. See Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127-28 (1st Cir. 1987). If the plaintiff fails to heed such warnings, it may not later defeat a statute of limitations challenge by arguing that the defendant fraudulently concealed facts on which the claim is based. See Kennedy, 814 F.2d at 803. Further, while the question of whether a plaintiff exercised reasonable diligence will often

---

[12]The Farmers Company bases its 1933 Act Claims on 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. 15 U.S.C. § 77m expressly covers claims based on § 77K and § 77L(a)(2), and case law establishes that it also supplies the limitations period for claims based on § 77o. See Herm v. Stafford, 663 F.2d 669, 679 (6th Cir. 1981).

depend upon disputed factual issues, the question may be resolved through a motion to dismiss if the complaint demonstrates that the plaintiff failed to timely assert its cause of action.  See Salois v. Dime Sav. Bank of New York, FSB, 128 F.3d 20, 26 (1st Cir. 1997).

In this case, the facts pleaded in the second amended complaint demonstrate that the 1933 Act claims are barred by the statute of limitations.  It is undisputed that the Farmers Company did not assert its 1933 Act claims until more than a year after the release of both the Tice Report and the Norris article. The Tice Report alleged that Tyco was improperly using the pooling of interests accounting method and "cookie jar" reserves "to keep the illusion of margin expansion and growth alive."  The Norris article expanded upon these allegations and specifically alleged that Tyco had used its improper accounting scheme in both the AMP and USSC mergers.  Thus, more than a year prior to the filing of the second amended complaint, the Farmers Company was on notice of its potential claims that the defendants had violated the 1933 Act by using an improper accounting scheme to conceal allegedly false and misleading statements contained in the February 1999 registration statement concerning the AMP

merger.

That Farmers Company had sufficient information to bring its 1933 Act claims within a year of the publication of the Tice Report and the Norris article is underscored by the fact that a number of plaintiffs were able, within a year of the appearance of these publications, to assert claims under the PSLRA-governed Exchange Act based on the same allegedly improper accounting scheme implicated by these claims. The TSG has failed to offer any persuasive explanation for its alleged inability to assert its 1933 Act claims along with its Exchange Act claims. Accordingly, I dismiss the 1933 Act claims because they are barred by 15 U.S.C. § 77m.[13]

## III.  CONCLUSION

For the reasons set forth herein, the TSG's Exchange Act claims are not pleaded with the particularity required by the

---

[13]I have not attempted to determine whether the 1933 Act claims are saved by the relation-back provisions of Fed. R. Civ. P. 15(c) because, although defendants discussed Rule 15(c) in their motion to dismiss, the TSG elected not to defend on this basis. Thus, they have forfeited any potential relation-back argument. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("[t]he district court is free to disregard arguments that are not adequately developed").

PSLRA and the Farmers Company's 1933 Act claims are barred by that Act's statute of limitations. Accordingly, I grant defendants' motion to dismiss [document no. 50]. In doing so, I herewith state that I have been presented with no argument, and find no basis for concluding, that any of the parties or attorneys have engaged "abusive litigation" within the meaning of 15 U.S.C. § 78u-4(c) (referencing Fed. R. Civ. P. 11(b)). Accordingly, I decline to award any sanctions. The Clerk is directed to close the case and to send a copy of this order to the Clerk of the Panel on Multidistrict Litigation.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

February 22, 2002

cc: Michael J. Beck, Judicial Panel on MDL
Frederick E. Upshall, Jr., Esq.
Joseph H. Weiss, Esq.
Norman Berman, Esq.
Jeffrey M. Haber, Esq.
Edward A. Haffer, Esq.
Stephen S. Madsen, Esq.
Lewis J. Liman, Esq.
Paul Young, Esq.